

474

In The United States District Court

Larry E. Johnson
        Petitioner

V.

Warden Perry Phelps
And the Attorney General
Of the State of Delaware
                Respondents



Petition Under USC (28) 2254
Unit of Habeas Corpus

Appendix to opening Brief

July 21, 2008

Pro SE, Larry E. Johnson #277320
        1181 Paddock Rd.
        Smyrna, DE
                19977

# Table of Contents

Page

Acquittal Argument                          A1- A6

Trial Courts Ruling                         A7- A10

Officers testimony                          A10- A20

1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,          ID# 0309013358
                                 0309013375

v.

DONALD COLE,
LARRY JOHNSON,
        Defendants.

BEFORE:    HONORABLE SUSAN C.DelPESCO, J.
           and jury

- - - - - - - - - - - - - -
Pre-trial and Opening Statements
    JULY 20, 2004
- - - - - - - - - - - - -

SUPERIOR COURT REPORTERS
500 North King Street, Suite 2609
Wilmington, Delaware 19801-3725
        (302) 255-0570

---

1              JULY 20, 2004

               Courtroom No. 8B

2              9:30 a.m.

3  PRESENT:

4        As noted.

5              - - - - -

6

7        MR. MILLER: Your Honor, good morning. We

8  were sitting in the anteroom. We are still

9  discussing and having a strategy meeting, for lack

10 of a better term, on this issue of Johnson's prior

11 acquittal. Will the Court grant us another five

12 minutes or so until quarter after to finish this

13 discussion?

14       THE COURT: Yes. However, if there's any

15 authority that anybody wants me to consider in

16 connection with any of the arguments this morning,

17 I would like to see it now.

18       MR. FIGLIOLA: Your Honor, I can state, and

19 Mr. Miller agrees, there is absolutely zero

20 authority directly on point as to what happens with

21 the fact that there was an acquittal in the case.

22       THE COURT: Okay. Well, then your answer is

23 no --

---

2

APPEARANCES:

        WILLIAM L. GEORGE, JR., ESQ.
        DANIEL R. MILLER, ESQ.
        Deputy Attorney General
          for the State

        MICHAEL C. HEYDEN, ESQ.
        JAN A.T. vanAMERONGEN, JR., ESQ.
          for the Defendant Donald Cole

        ANTHONY A. FIGLIOLA, JR., ESQ.
        EDWARD C. PANKOWSKI, JR., ESQ.
          for the Defendant Larry Johnson

10
11
12
13
14
15
16
17
18
19
20
21
22
23

1 of 15 sheets

---

4

1        MR. FIGLIOLA: Nothing directly on point. I

2  have three cases that may lend some guidance to

3  Your Honor, one is State of Delaware versus William

4  T. Hardin. It was an opinion by Judge Cooch in the

5  Superior Court. Then Leeallan D. Cobb versus State

6  of Delaware and Arthur Milligan versus State of

7  Delaware. Milligan dealt with a conviction in the

8  State of Maryland where acquittal was granted.

9        Also, Your Honor -- and I did not bring a

10 copy of this because for some reason it only would

11 print out to page nine. State of Delaware versus

12 Frank Joseph Sherrin, 441 A.2 235, lends some

13 guidance to it, in particular, concerning federal

14 charges and what had to be proven, etcetera.

15       THE COURT: All right. Well, then, we will

16 recess for what, ten minutes?

17       MR. MILLER: We have two cases. Neither of

18 them directly address the acquittal issue. But I'm

19 handing them forward because they generally touch

20 upon this, which is Dowling versus United States

21 and State versus Mauchin. Thank you, Your Honor.

22       THE COURT: All right.

23       (Brief recess. )

5

1    THE COURT:  Good morning.  Who would like to
2  begin?
3    MR. MILLER:  I can do that, Your Honor.
4    THE COURT:  All right.
5    MR. MILLER:  Judge, we take the firm
6  position, and the same position that we took
7  yesterday, there are multiple reasons why, number
8  one, this evidence is admissible, which is, from
9  Detective Silvers and other fact witnesses that saw
10 Mr. Johnson at the time of the vehicle stop on
11 November the 12th.
12    Basically the issues, as far as
13 admissibility go, are addressed in both the Dowling
14 case and the Mauchin case, Judge Cooch's decision,
15 those decisions both stand for the proposition that
16 unless the prior proceeding had the same burden of
17 proof, number one, and, number two, all of the
18 items of all the offenses were precisely the same,
19 then the State is not collaterally estopped by the
20 double jeopardy clause from introducing evidence of
21 prior or subsequent conduct, in this case
22 subsequent conduct, connecting the defendant under
23 -- in this case to the gun that was found under the

6

1  vehicle, which is subsequently ballistically linked
2  to the murder scene itself.
3    The Dowling case -- none of the cases I
4  should say, address the issue of whether it is
5  proper for the trial court, or anybody, to
6  introduce evidence of the fact, if it is a fact,
7  that a defendant has been acquitted of the charge,
8  or, in this case, subsequent conduct, in the
9  Dowling case prior conduct, that he went to trial
10 for and was acquitted.
11    In the trial court's decision and in the
12 Third Circuit decision it's noted that the trial
13 judge did advise the jury in the Dowling case that
14 the defendant had been previously acquitted.  The
15 Supreme Court in the Dowling decision I handed up
16 to the Court doesn't touch it at all.  Justice
17 White's decision does not address, one way or the
18 other, whether they think that advising the jury
19 that a defendant has previously been acquitted of
20 charges that the State is subsequently seeking to
21 admit is proper or improper, which leads us to the
22 decision, number one, as far as the admissibility
23 of Detective Silvers' testimony, let's call it the

1  fact testimony of the scene, which is clearly
2  admissible under both Dowling and Mauchin.
3    But, number two, with the same evidentiary
4  argument that the State made yesterday, if this
5  jury is told either by the Court or through a
6  witness that defendant Johnson on a previous
7  occasion was charged with and acquitted by another
8  jury of possession of this particular weapon and
9  whether it was transported in Interstate Commerce,
10 they will by definition be speculating as to what
11 the reasons were that that jury may have done that.
12    We don't know, and this jury won't know,
13 what the witnesses testified like, how they
14 appeared on the stand, their demeanor.  This jury
15 won't know why that other jury may have decided
16 what it decided, whether it was based on questions
17 about whether the defendant was actually in
18 possession of the gun or whether he was not,
19 whether it was related to the Interstate Commerce
20 element.  But even putting that aside, it's still a
21 different burden of proof, and the jury would be
22 sitting here, hearing the evidence and not having
23 to make a decision as to the burden of proof that

8

1  doesn't exist as to the November 12th stop whereas
2  in the prior case the jury was charged that the
3  burden of proof was beyond a reasonable doubt.
4    The prejudicial impact on this jury of
5  finding out what another jury, with a different
6  burden of proof, on a different occasion, with
7  different elements of the crime and also different
8  evidence decided as to whether Mr. Johnson was in
9  possession of that gun.
10    For example, let's assume for purposes of
11 discussion that it is a fact, and it is, I can
12 represent to the Court, that that jury on the prior
13 occasion never heard testimony from Travanion
14 Norton or any other witness that tied Mr. Johnson,
15 a second eyewitness, that tied Mr. Johnson to this
16 particular gun, nor did they hear the ballistics
17 tie in.
18    In our case here we have evidence from
19 Travanion Norton that defendant Johnson was in
20 possession of that gun.  We have evidence from
21 Detective Silvers that Johnson was in possession of
22 that gun on November 12th.  And we have a
23 ballistics expert that links the two weapons.

1  The prior jury did not hear from the

2  ballistics expert and they didn't hear from

3  Travanion Norton.  All they had to rely on was the

4  police testimony.  And, again, I don't want to

5  overstate it, but, for the last time, different

6  burden of proof, different facts, different jury.

7      THE COURT:  What is the applicable burden of

8  proof here?

9      MR. MILLER:  Preponderance of the evidence.

10     THE COURT:  Because it's not a crime

11  charged?

12     MR. MILLER:  That's correct, Your Honor.

13  It's an issue of admissibility.  It's noted in the

14  Dowling position.  Huddleston versus the United

15  States is the case that decided that when you are

16  introducing evidence of other conduct, not charged

17  conduct, the burden of proof is -- it is a

18  question, number one, for the trial judge and the

19  issue is preponderance of the evidence.

20     THE COURT:  Will it be necessary for the

21  police officer to say that there was an arrest?  In

22  other words, here's my question:  It isn't

23  necessarily illegal for a person driving an

10

1  automobile who is stopped by the police, and even

2  if they choose to discard the weapon, that's not

3  necessarily a crime, is it?

4      MR. MILLER:  It's actually not a crime, Your

5  Honor.  If you're in possession of a weapon and

6  it's not concealed and you're not a person

7  prohibited, it's not illegal conduct.

8      THE COURT:  Will it be necessary for the

9  officer to say that there was an arrest?

10     MR. MILLER:  It would be almost impossible

11  for him not to say that, because the circumstances

12  he will testify to are that he was walking up to

13  the car -- I'm summarizing but he -- they saw the

14  defendant sitting in the car, they swung their

15  vehicle around, as he was walking up to

16  Mr. Johnson, Mr. Johnson and he made eye contact,

17  Mr. Johnson had a female on his lap at the time, he

18  pushed her out the door of the car, threw something

19  under the car, the detective heard the clink of

20  metal on concrete or asphalt and he immediately

21  drew his weapon and pointed it at Mr. Johnson,

22  ordered him out of the car, arrested him --

23  actually waited for back up to come, and after back

1  up came and all the occupants in the car were

2  secured, then he looked under the car, saw that the

3  weapon was there.

4      Do we need to get into the fact that he was

5  formally arrested?  I don't think so.  But we do

6  need to be able to get into the fact that --

7  there's no way of separating out the fact that the

8  detective had to pull his gun or felt the need to

9  pull his gun based on Mr. Johnson's actions and

10  that he was, at least, detained at the scene.

11     I don't think -- even if the jury --

12  obviously, Your Honor, if the jury found that he

13  had been arrested -- I mean I guess arguably

14  Johnson could claim some prejudice, but if they

15  don't later find out that he wasn't formally

16  charged or that he was indicted in Federal Court,

17  they don't need to know those things.  I don't

18  think there's a way really of -- I would call it I

19  guess inextricably intertwined doctrine.  In other

20  words, there's no way of pulling out of there.

21     THE COURT:  You can certainly say he was

22  detained.

23     MR. MILLER:  I would be happy to use that.

12

1  And I will instruct the witnesses not to say he was

2  arrested.  It's just from my standpoint or the

3  standpoint of the State it's always a dangerous

4  road to say we're not going to use the word victim

5  or arrest, we're not going to do this and it

6  happens and then there is a request for a mistrial.

7      I don't think that we need to make a ruling

8  that the police cannot say they arrested him.  We

9  just need to avoid discussion of the formal arrest

10  and the fact that he was subsequently indicted and

11  prosecuted.

12     THE COURT:  All right.  Can I hear from

13  counsel for Mr. Johnson?

14     MR. FIGLIOLA:  Your Honor, I expressed

15  yesterday -- I agree with Mr. Miller's assessment

16  to the Court that there is absolutely no case law

17  out there that addresses the real issue that we

18  brought up yesterday, that is, whether the fact

19  that Mr. Johnson was acquitted of these charges

20  should go in front of the jury.

21     What I've heard this morning is that, in

22  essence, the State is going to be trying

23  Mr. Johnson on those charges again.  They're going

**13**

```
 1  to put to detective on there, describe what he
 2  claims he saw, the same facts that he gave to the
 3  Court in Federal Court where the burden of proof
 4  was beyond a reasonable doubt, and a jury in that
 5  Federal Court has acquitted Mr. Johnson of these
 6  charges.
 7       Now, in reviewing the Dowling case, in
 8  reviewing the Sherrin case we look at what the
 9  Federal Government had to prove and what the State
10  of Delaware would have had to prove and if in fact
11  these charges were brought in State Court.
12       THE COURT: Why does that help? The issue
13  here is admissibility and the question here is the
14  burden of proof.
15       MR. FIGLIOLA: The point is this, Your
16  Honor, if Mr. Johnson has been acquitted of these
17  charges, what, in essence, the State is doing by
18  putting these charges in front of the jury again is
19  trying Mr. Johnson for the same crime for which he
20  has been acquitted.
21       Now, we're not disputing the fact that they
22  can say Mr. Johnson was found with a weapon. Our
23  point is full disclosure says you gotta tell the
```

**14**

```
 1  jury he was found with a weapon, he was charged and
 2  he was acquitted.
 3       THE COURT: Okay. So you're not saying that
 4  the State can't offer the testimony, you're just
 5  saying that they have to go the next step?
 6       MR. FIGLIOLA: Correct. I mean they're
 7  talking about prejudice to them. What about
 8  prejudice to the defendant? He's the one that's on
 9  trial for his life. That's the prejudice we have
10  to look at. This is a prior act or an act
11  associated with this --
12       THE COURT: It's subsequent in time.
13       MR. FIGLIOLA: Subsequent in time. But it
14  is an act. It's tied in to this matter. He was
15  charged with the crime. He was acquitted of the
16  crime. That is relevant evidence to the innocent
17  or guilt of this man.
18       Now, that doesn't say that because the jury
19  found that he didn't have a gun on November the
20  11th, that he didn't have a gun in August, but the
21  jury is entitled to know that in another Court the
22  exact same charges on the exact same evidence that
23  the State wants to put in front of this jury this
```

**15**

```
 1  man was acquitted.
 2       Now, the State, in essence, by putting in
 3  that evidence, they're going to force the defendant
 4  to defend for a second time charges that he has
 5  already been acquitted of. That was not a plan by
 6  the defense. It was not contemplated by the
 7  defense. I'm not saying we couldn't do it. I
 8  don't know. We have to find the witnesses that
 9  were there at the time. I've talked with
10  Mr. Natale this morning who defended Mr. Johnson.
11  But that's what the State, in essence, is asking
12  the Court to allow, a retrial of Mr. Johnson on
13  these charges.
14       If they want to put the evidence in, that's
15  fine, but we should be entitled to let the jury
16  know that he was acquitted of these charges in
17  Federal Court. That's our position.
18       THE COURT: Okay. Does this have anything
19  to do with opening statements?
20       MR. FIGLIOLA: Well, I think it may. If
21  it's referred to in opening statement and Your
22  Honor rules, depending on Your Honor's ruling, it
23  may create problems later on.
```

**16**

```
 1       THE COURT: Okay. Let me hear from the
 2  State.
 3       MR. MILLER: May I have one moment with
 4  counsel, Your Honor?
 5       THE COURT: Yes.
 6       MR. HEYDEN: Your Honor, may I address on
 7  this question also?
 8       THE COURT: Just a moment.
 9       MR. MILLER: Can we hear from defendant Cole
10  while we're having this discussion, Your Honor?
11       MR. HEYDEN: Just briefly, Your Honor. The
12  facts concerning the stop and seizure of the gun,
13  as I understand it, was at -- there was a number of
14  people, six, seven people, sitting in a car. The
15  police officer approached the car, and, as he did
16  that, he heard a thud that sounded like metal hit
17  the ground.
18       Now in his report, and I don't think this
19  will be disputed by the State, the police officer
20  is not going to testify that he saw that gun in the
21  actual possession of Mr. Johnson. But he got there
22  and he jumped or reached a conclusion that
23  Mr. Johnson, as opposed to the other people in the
```

17                                                    19

1 car, was the person who was in possession of the

2 gun.

3     Now, the case goes to trial in Federal Court

4 and the jury acquitted Mr. Johnson. They reached a

5 different conclusion based upon the evidence. So

6 we have the police officer looking at some evidence

7 and jumping to a conclusion and you have the jury

8 looking at evidence and reaching a conclusion. I

9 don't think the State could have it both ways.

10     I don't think they can come in and let this

11 officer testify and give the impression to the jury

12 that he saw Mr. Johnson in possession of this gun

13 without letting the Court permit the defense to

14 introduce the acquittal into evidence.

15     So I think it's either they -- if they both

16 come in, that's fine, but if we don't get the

17 acquittal into evidence, I don't think the police

18 officer's conclusion is permissible.

19     MR. MILLER: Your Honor, I have a compromise

20 position. It's clear from the case law that the

21 evidence is admissible and it's not collaterally

22 estopped based on the cases that have been

23 provided. The issue has evolved into the admission

1 was going to be able to introduce there was an

2 acquittal it wouldn't be until, at least, that

3 point where either the Court or someone else would

4 inform the jury what happened.

5     So we have a couple of days. I think that

6 may be the wisest position. We obviously feel it's

7 important for this jury to know in opening the

8 allegations related to the vehicle stop, and we

9 have made those intentions known for six months or

10 more. We're presented with a situation on the eve

11 of trial where the defense, in response to a State

12 inquiry, let its position be known about

13 introduction of an acquittal where the case law is

14 either vacant or we haven't been able to find it

15 yet. And it seems to me that we should defer the

16 issue.

17     I'm sure the defense -- in speaking to

18 Mr. Figliola, he wants to bring it up in his

19 opening because he wants the jury to know that.

20 But the defense has put the Court and the State in

21 a position of not being able to fully research a

22 fairly important and potentially -- fairly

23 important issue on the eve of -- you know, we're

18                                                    20

1 of the acquittal or not.

2     So as far as Mr. George in his opening can

3 refer to this vehicle stop and what was seen and

4 what was allegedly recovered during the vehicle

5 stop, it appears, unless there's case law to the

6 contrary that I haven't seen yet, that that

7 evidence is admissible.

8     That leads to the second question of the

9 acquittal. This came up -- I mean we are in a

10 capital murder trial. This came up yesterday

11 afternoon, the first time, at least, I became aware

12 that the defense intended to attempt to introduce a

13 verdict of a jury in another case to rebut the

14 State's argument here.

15     I think we defer the issue of ruling

16 presently on whether the acquittal is admissible or

17 not, because we really don't know right now whether

18 it is or not. And maybe -- and I did what I could

19 last night. But it would be -- I think the

20 appropriate thing to do is to put the issue aside

21 for now, allow the openings to go forward. And

22 we're not going to get to Detective Silvers'

23 testimony for a couple of days. And if the defense

1 supposed to open in five minutes. So that seems to

2 me to be the course that we are requesting, Your

3 Honor.

4     MR. FIGLIOLA: Your Honor, I know I was not

5 put on notice. I don't believe Mr. Pankowski was.

6 And I don't know about the other defendant. We

7 were aware of this charge certainly. We had no

8 idea the State was going to do anything with it

9 until yesterday.

10     THE COURT: With what?

11     MR. FIGLIOLA: Bringing in the fact that

12 Johnson was arrested with a weapons charge, because

13 he was acquitted.

14     THE COURT: Well, the link of that third

15 incident has been on the table since the first.

16     MR. FIGLIOLA: We knew about it. Nobody

17 said they were going to use it.

18     MR. MILLER: Your Honor, that is a difficult

19 position for the State to accept. We have provided

20 the ballistics analysis to the defendants and the

21 expert opinion.

22     THE COURT: I think that it's clear now that

23 we narrowed it down to very specific issue, and,

1  that is, not whether or not the evidence can come
2  in as to the stop but whether or not the evidence
3  can also come in as to the acquittal. And as has
4  been said we're supposed to have opening statements
5  in a few minutes. And it seems to me while it
6  would be preferable to have the ruling in advance
7  of opening statements, under these circumstances it
8  is too significant a ruling for me to have to
9  consider based on authority handed to me at
10  five minutes after ten. So I will adopt the
11  State's recommendation and I will defer it until I
12  can resolve it.
13      But I will tell you that based on my cursory
14  review of what's been provided, I'm satisfied that
15  it's admissible and it's just a question of whether
16  or not the defendant will have the opportunity to
17  inform the jury that there was an acquittal of the
18  charges.
19      MR. FIGLIOLA: Your Honor, the problem I
20  have with -- Mr. Miller and I did discuss that.
21  The problem I have with that, Your Honor, is that
22  you're allowing -- if my understanding is correct,
23  you're allowing the State to bring out this

1  proposed redactions is fine with defendant Johnson.
2  I spoke with Mr. Van Amerongen. He provided me
3  with three areas where there is a disagreement.
4  Two of the three areas I am going to agree with him
5  and take in or put out what the defense requests.
6  The only area of disagreement that remains is to
7  whether the State can admit the evidence of
8  Mr. Cole's alleged threats to Mr. Norton a couple
9  of days after the incident.
10      If the Court can provide a ruling to us
11  based on that, then I can have a paralegal get that
12  transcript, at least maybe at lunchtime time, at
13  least, we can send it to the engineer. He's
14  indicated he can produce the tape overnight.
15      THE COURT: I need to have something in some
16  context. The statement has previously been
17  provided, I suppose, but I don't have it in front
18  of me. This doesn't have any bearing on opening
19  statements, does it?
20      MR. MILLER: It does not. It just has a
21  bearing on me getting this information, you know --
22  getting this information to the sound engineer so
23  he can make the redactions or not, depending on how

22

1  evidence in their opening statement, yet I'm not
2  going to be allowed to address it in my opening
3  statement.
4      THE COURT: Correct.
5      MR. FIGLIOLA: That's a problem.
6      THE COURT: Well, it is a problem. But
7  you're defending -- and if it's ultimately
8  determined to be admissible, I think it's perfectly
9  logical that in your defense of the case you can
10  bring that out. That's just the way it is given
11  the circumstances that we have at this point.
12      All right. Is there anything else before
13  opening statements? Has the State's witness, the
14  woman that you mentioned yesterday, did she appear?
15      MR. MILLER: Yes, Your Honor.
16      THE COURT: So are we going to open and we
17  are going to start, right?
18      MR. MILLER: Yes, Your Honor.
19      There is one other issue, Your Honor, we
20  discussed yesterday in terms of this 3507 statement
21  from Mr. Norton and the potential use of that.
22      Mr. Figliola has indicated to me that the
23  transcript that we provided to him with the

24

1  the Court rules. There's no dispute of fact of
2  what is alleged to have been said, just a question
3  of whether or not evidence is admissible or not.
4      THE COURT: I don't want to have to deal
5  with this on the fly. I need to look at this in
6  context. There were two issues yesterday. I'm
7  trying to remember. One of them had to do with the
8  statements while they were on the same pod. I
9  surmise you're abandoning that?
10      MR. MILLER: It doesn't relate to the 3507
11  statement and I probably will abandon it, but
12  that's not on the table right now, Your Honor.
13      THE COURT: Well, all right.
14      MR. MILLER: I wouldn't go into that without
15  bringing it up to everybody again, because
16  obviously there are concerns that are raised.
17      THE COURT: I would like to defer the 3507
18  discussion until I've heard opening statement and
19  you get started here. I realize that may not be
20  convenient, but it's not convenient for me to
21  decide that right now.
22      MR. MILLER: Very good, Your Honor.
23      THE COURT: That's what you're asking me to

| | |
|---|---|
| 1 **Q.** So they never talked about what they were | 1 kicking and then after that there was shooting, so |
| 2 going to take? | 2 I didn't see nobody searching too much for nothing. |
| 3 **A.** No. | 3 **Q.** So nobody searched for anything, two people |
| 4 **Q.** In fact, they never said they were going to | 4 come of a doorway and they are in essence executed? |
| 5 take anything, did they? | 5 **A.** Yes. |
| 6 **A.** They said a sting. | 6 **Q.** Was it is after this execution that Sticky |
| 7 **Q.** A sting. | 7 found out who Connect was? |
| 8 Now, when you saw them going into your | 8 **A.** No. I'm not even too sure when he found |
| 9 friend's house, Shaheed, did you pick up your cell | 9 out. |
| 10 phone and call Shaheed and say, warn your parents? | 10 MR. FIGLIOLA: Nothing further. |
| 11 **A.** No. | 11 THE COURT: Mr. Miller. |
| 12 **Q.** You didn't? | 12 MR. MILLER: May I have one moment. I don't |
| 13 Now, at this time did you have the gun in | 13 think that prompts any redirect, Your Honor, but I |
| 14 your hand. | 14 would like to have a moment. |
| 15 **A.** No. I mean what time are you talking about? | 15 THE COURT: Very well. |
| 16 **Q.** When you see Mr. Cole up -- | 16 MR. MILLER: That prompts no redirect. |
| 17 **A.** I would ask that you be direct. Because | 17 Thank you, Mr. Norton. |
| 18 some of these questions I don't understand. | 18 MR. HEYDEN: Nothing, Your Honor. Thank |
| 19 **Q.** All right. When did you get the gun? Let's | 19 You. |
| 20 be direct . | 20 THE COURT: Very well. You may remove |
| 21 **A.** In the car. | 21 Mr. Norton. |
| 22 **Q.** In the car. So what you're standing there, | 22 MR. MILLER: Your Honor, may I step outside |
| 23 when you get to Shaheed's house, you see Mr. Cole | 23 just to check and see if a witness is here? |

|  110 |  112 |
|---|---|
| 1 going through a window, okay, you had the gun in | 1 ✱ THE COURT: I'm thinking about a recess. |
| 2 your hand? | 2 How are you guys doing? Are you doing all right? |
| 3 **A.** No, I didn't have it in my hand. | 3 THE JURORS: Fine. |
| 4 **Q.** Where was it? | 4 THE COURT: All right. |
| 5 **A.** It was in my possession but it wasn't in my | 5 You may step out. |
| 6 hand. | 6 MR. MILLER: Thank you, Your Honor. |
| 7 **Q.** Okay. But you had it? | 7 State calls Detective Jeff Silvers please. |
| 8 **A.** Yeah. | 8 THE COURT: Could I see the attorneys at |
| 9 **Q.** Did you ever think of pointing the gun at | 9 sidebar please. |
| 10 Mr. Cole and say, stop right there? | 10 (The following sidebar conference was held.) |
| 11 **A.** No. | 11 THE COURT: I want to hear his testimony |
| 12 **Q.** No. Why not? | 12 outside the presence of the jury. |
| 13 **A.** I mean I just didn't. I mean you have to | 13 MR. MILLER: Okay. We have a transcript of |
| 14 think. Mr. Cole and Mr. Johnson was in the | 14 his prior testimony at the suppression hearing |
| 15 backyard, so if I pointed the gun at Mr. Cole to | 15 with me. I know exactly what he said then and he |
| 16 stop, how do you know Mr. Johnson wouldn't have | 16 probably will say it now. |
| 17 shot me. | 17 THE COURT: Well -- |
| 18 **Q.** You weren't willing to take the chance? | 18 MR. HEYDEN: It's a dangerous area. |
| 19 **A.** No, not at all. | 19 MR. MILLER: I guess I'm misunderstanding. |
| 20 **Q.** So after this sting started what did they | 20 I'm not seeing what the issue is. I thought we had |
| 21 look for inside the house? | 21 overcome this. You mean the acquittal issue? |
| 22 **A.** I don't know. Like I told you I came in | 22 THE COURT: Yes. |
| 23 when I heard the bang. After I came in there was | 23 MR. MILLER: I don't know in any way that it |

| | |
|---|---|
| 1 would be introduced that it would be through this | 1 that. What's wrong with that, in this case, as I |
| 2 witness. | 2 understand it, was the fact that he was stopped, |
| 3 THE COURT: That's what I'm trying to | 3 that the policeman approached him, that for |
| 4 determine. | 4 whatever reason the police thought they needed to |
| 5 MR. MILLER: I think it is a legal issue. | 5 investigate, that he made a gesture and that later |
| 6 It doesn't have to do with the words that he spoke. | 6 the gun was found under the car. |
| 7 THE COURT: It has a lot to do with the | 7 Now, is there anything more than that? |
| 8 words that he speaks. To me I need to know what | 8 MR. MILLER: Other than the fact that |
| 9 boundaries I can put on this, because I just see | 9 when -- the officer will say when he reached down, |
| 10 this whole thing as a slippery slope. If he would | 10 he was sitting there, he saw him, he reached down, |
| 11 get to a point where we talk about arrests and I | 11 the officer immediately thought that he was going |
| 12 have to deal with the equity of not getting into | 12 for something and he pulled his gun out and drew on |
| 13 the fact that he was acquitted, and it could go | 13 it. |
| 14 into the fact that he was acquited. And then I | 14 THE COURT: Okay. But the point is that |
| 15 have to get into the fact what acquittal means. | 15 once you get that in, what happened after that |
| 16 And it doesn't mean he was innocent. It means that | 16 doesn't matter. |
| 17 the State hasn't met its burden of proof. | 17 MR. MILLER: It's fine with me. But we're |
| 18 I far prefer to put some boundaries on his | 18 going to have to instruct him on that. |
| 19 testimony. I would have asked for the transcript | 19 THE COURT: Okay. Is everybody on the same |
| 20 before. I didn't know. | 20 page here? |
| 21 MR. FIGLIOLA: Your Honor, I got it from | 21 MR. MILLER: I would have to take him back |
| 22 Mr. Natale, who represented Mr. Vanson in Federal | 22 out of the court room. |
| 23 Court, I guess Tuesday this week. We made copies | 23 THE COURT: That's all right. We will |

| 114 | 116 |
|---|---|
| 1 and I gave Mr. Miller a copy yesterday. | 1 recess for a couple of minutes then. |
| 2 THE COURT: Okay. Well, I'm not faulting | 2 MR. MILLER: All right. |
| 3 anybody. I'm just saying the only thing I could | 3 THE COURT: We are going to have a brief |
| 4 think of in terms of trying to get a handle of his | 4 recess. Take the jury out please. |
| 5 testimony is to hear it. But I didn't know there | 5 (Jury leaves courtroom at 4:20.) |
| 6 was any alternative available. It still seems like | 6 THE COURT: Recess for 10 minutes. |
| 7 the best thing to do under the circumstances. It | 7 (Brief recess.) |
| 8 sounds to me based on earlier representations -- | 8 THE COURT: I've given you a curative |
| 9 well, let me back up. | 9 instruction that I prepared and invite your |
| 10 I suggested earlier to the State that you | 10 comments. |
| 11 get the facts in and that you not talk about an | 11 MR. FIGLIOLA: Your Honor, I guess the first |
| 12 arrest. And you said you couldn't do that, that | 12 thing is since we're getting a back action |
| 13 that was just unmanageable or something. | 13 instruction, which we would anticipate, I question |
| 14 MR. MILLER: What -- I'm sorry, Your Honor, | 14 whether Your Honor needs to do a Getz analysis for |
| 15 I don't mean to interrupt. What I was trying to | 15 the record. |
| 16 say, I think doing that sometimes makes it -- it | 16 After that's done, as to this instruction |
| 17 makes it difficult, because if somebody slips and | 17 itself, we object to the last sentence nor are you |
| 18 says something then we have an issue. | 18 to speculate about the outcome of the |
| 19 I can advise him of that. I mean and tell | 19 November 12th, 2001 vehicle stop. We simply |
| 20 him look, all you're going to say is detained, | 20 suggest there was, in fact, an arrest, charges and |
| 21 because they called for backup, they put him on the | 21 subsequent litigation, and if we're not going to be |
| 22 curb, they handcuffed him. | 22 able to state that that litigation resulted in a |
| 23 THE COURT: I'm sure you have to get to | 23 judging of acquittal, we would rather not have it |

1  in there.

2      THE COURT:  I would -- I put that in there

3  because I thought you would like it.  So I merely

4  didn't anticipate your reaction.  Would you prefer

5  that I strike that last sentence?

6      MR. FIGLIOLA:  Yes.

7      THE COURT:  You would rather have him

8  speculating or wondering about what happened

9  without any direction?  Because they're not going

10 to hear the whole story.  All they're going to hear

11 is part of the story and that later the police

12 retrieved the gun.  I mean we could add something

13 in the final instructions if you want.

14     MR. FIGLIOLA:  I anticipate, Your Honor,

15 that -- I anticipate Mr. Johnson testifying, I had

16 anticipated going into detail on Mr. Johnson's

17 convictions, one of which will not relate to this

18 incident, so I think --

19     ──THE COURT:──  All right.  Fine.  That was put

20 in there for your benefit.  If you prefer to have

21 it stricken, unless the State feels differently, I

22 will strike it.

23     MR. MILLER:  We take no position, Your

                                                    118

1  Honor.  I don't know what Cole's position is, if

2  there is one.  But I would like to know what that

3  is before we go forward.

4      THE COURT:  We're just about running out of

5  time for the day.

6      MR. HEYDEN:  We take no position, Your

7  Honor.

8      MR. MILLER:  Same.  We're fine with taking

9  the sentence out, Your Honor.  If the defendant

10 Johnson wants it out, then we're okay with that.

11     THE COURT:  The question of a balancing

12 here, I think it's obvious, or at least I think

13 perhaps I should ask the State.  It appears to me

14 that your objective in presenting this evidence is

15 identification.

16     MR. MILLER:  Correct.

17     THE COURT:  And that's done through the

18 ballistics, that's your theory?

19     MR. MILLER:  Yes.

20     THE COURT:  Okay.  And that's why it's

21 admissible?

22     MR. MILLER:  Right.  He's actually in

23 possession of one of the guns that was used at the

---

1  murder scene.  We will argue it's not a bad act

2  because he didn't get caught doing anything illegal

3  with it, but we're okay giving the instruction if

4  defendant wants that.  We think if he wants the

5  last sentence stricken, we're okay with that too.

6      THE COURT:  But the point is -- Mr. Figliola

7  is approaching the podium.

8      MR. FIGLIOLA:  The point is, Your Honor, he

9  was not found in possession of it.  It was found

10 under the vehicle he was in.  That's different than

11 being in possession of it.

12     I guess, for argument sake, if Mr. Miller

13 wants to say he was in possession of that that's an

14 issue -- the possession issue went to a jury.

15     THE COURT:  I understand.  But my concern

16 here -- do you differ on the concept of a curative

17 instruction?

18     MR. FIGLIOLA:  No.  I think it needs a

19 curative instruction.

20     THE COURT:  All right.  And I think we're

21 all saying the same thing here.  I have to give the

22 instruction.  And to the extent there's any issue

23 as to whether or not the probative value outweighs

                                                    120

1  the prejudicial effect, I think it's clearly

2  material and I'm not going to read that phase, by

3  the way, and the words bad act I just wrote that

4  for my benefit.  It's an issue and relative to the

5  dispute in this case, and therefore I will permit

6  the testimony to be offered.

7      The question is, can we get it in in

8  20 minutes?

9      MR. MILLER:  I'm going to be fairly trimmed

10 down with my direct, but it will still take ten

11 minutes.

12     THE COURT:  Should we resume with this

13 tomorrow morning or not?

14     MR. MILLER:  I would prefer to do it now,

15 Your Honor, even if it goes a few minutes past

16 five.

17     THE COURT:  Okay.  Let's bring the jury in.

18 (Jury enters courtroom at 4:40.)

19     JEFFREY SILVERS, having been called on the

20 part and behalf of the State as a witness, being

21 first duly sworn under oath, testified as follows:

22                 THE COURT:  Before you start,

23 Mr. Miller.  Ladies and gentlemen, you're about to

1  hear testimony regarding a vehicle stop involving

2  Larry Johnson which occurred on November 12th,

3  2001.

4       Its evidence is provided by the State in

5  support of its claim that Larry Johnson was

6  involved in the August 31st, 2001 murders on 23rd

7  Street.

8       You may consider the testimony offered for

9  one purpose only, and that purpose is determining

10  whether the State has met its burden of proof

11  regarding the identity of the person or persons who

12  committed the murders on 23rd Street.

13       You may not use the information to draw

14  conclusions about Mr. Johnson's character.

15  .    All right. Mr. Miller.

16       MR. MILLER: Thank you, Your Honor.

17       DIRECT EXAMINATION

18  BY MR. MILLER:

19  **Q.** Officer Silvers, what unit -- or where do

20  you work, sir?

21  **A.** City of Wilmington Police Department.

22  **Q.** How long have you been a police officer?

23  **A.** Here approximately six-and-a-half-years. I

---

1  **Q.** And were you on foot or were you guys in

2  car?

3  **A.** We were in an unmarked police car.

4  **Q.** What area of the city were you in?

5  **A.** In the East Side of the city, the 600-block

6  East 5th Street.

7  **Q.** Okay. And did you notice anything -- strike

8  that. Let me back up. Who was driving, if you

9  remember?

10  **A.** Detective Richie.

11  **Q.** And where were you seated?

12  **A.** Behind the passenger, in the back seat.

13  **Q.** And did there come a time when either you or

14  someone else in the car noticed something that

15  caught your attention?

16  **A.** Yes.

17  **Q.** Tell the members of the jury what was

18  noticed.

19  **A.** We were driving south on Spruce Street,

20  Detective Taylor looked Westbound on 5th Street,

21  saw a group of people standing on the sidewalk

22  around a couple of cars there and suggested we go

23  down and check out what was going on.

---

122

1  was in another state for two years.

2  **Q.** Where was that?

3  **A.** In the State of Maine.

4  **Q.** So all told a little bit over eight years?

5  **A.** Yes.

6  **Q.** What is your current assignment?

7  **A.** Plain clothes detective in the drug,

8  organized crime and vice division.

9  **Q.** I see you have a goat-tee there. Is that

10  standard wear for the guys in Vice?

11  **A.** Yes. We don't wear uniforms. We generally

12  wear jeans and T-shirts to fit in better in the

13  neighborhoods.

14  **Q.** Were you working in Vice back on November

15  the 12th 2001?

16  **A.** Yes, I was.

17  **Q.** And how long had you been with the Vice

18  unit?

19  **A.** That was my first day.

20  **Q.** And were you working alone?

21  **A.** No, I was not.

22  **Q.** Who were you with?

23  **A.** Detective Taylor and Detective Richie.

---

124

1  **Q.** And what did you do or what did the car do?

2  **A.** Detective Richie continued down on 4th

3  Street, went west on 4th, then north on Pine Street

4  and then eastbound on 5th Street against one-way

5  traffic.

6  **Q.** Say again.

7  **A.** Against one-way traffic on 5th Street.

8  **Q.** So 5th Street is a one-way street?

9  **A.** In that section, yes, it's one way

10  westbound.

11  **Q.** And you guys went the wrong way?

12  **A.** Correct.

13  **Q.** Why did you do that?

14  **A.** Try to sneak up on them a little bit.

15  **Q.** Okay. And you mentioned that normally you

16  didn't wear a uniform in Vice.

17       It's your first day. Do you remember if you

18  had a uniform on that day?

19  **A.** No, I did not.

20  **Q.** Did you have a badge displayed in any

21  fashion?

22  **A.** Yes, I did. I had a badge on a chain

23  hanging around my neck about the center of my

1    chest.

2    **Q.** As best you can, I would like you to tell

3    the jury what you saw when you swung onto 5th

4    Street going the wrong way heading toward this

5    group that you mentioned.

6    **A.** Well, we made the right-hand turn onto 5th

7    Street. There was a group of people on the

8    sidewalk. As we got closer to the two cars,

9    Detective Taylor saw two people, two black males,

10   run off from the area.

11   **Q.** When you say from the area, what area are

12   you talking about?

13   **A.** From the 600 block of East 5th Street.

14   **Q.** The two people that took off running, were

15   they in the area of the street or were they in the

16   area of the sidewalk?

17   **A.** Sidewalk.

18   **Q.** Okay. Did you notice anything about any

19   vehicles that were in the area? Were there any

20   cars parked there?

21   **A.** Yes.

22   **Q.** Describe to the jury what you saw.

23   **A.** There was a light in color Chevy Lumina and

126

1    I believe it was a Dodge Stratus parked, a darker

2    colored Dodge Stratus, parked behind it.

3    **Q.** Which car, if either of them, did you have

4    your attention focused on?

5    **A.** The Lumina.

6    **Q.** Tell the members of the jury what you saw --

7    you mentioned your type of car was?

8    **A.** Our car was also a Chevy Lumina.

9    **Q.** So you're driving against traffic or the

10   wrong way on a one-way street in a Lumina, you're

11   in the back seat?

12   **A.** Correct.

13   **Q.** You notice there is a Lumina and then a

14   Stratus parked behind it?

15   **A.** Correct.

16   **Q.** Tell the members of the jury what you saw in

17   relation to the occupants of the Lumina.

18   · **A.** I focused on -- Detective Taylor was sitting

19   in front of me. And he's sort of a large man. I

20   couldn't see a whole lot around him. I focused on

21   the driver's side of the vehicle. That's all I

22   could see.

23   **Q.** In terms of the way their vehicle was

1    facing -- you indicated you went the wrong way.

2    Were they facing towards you, in other words, their

3    headlights facing towards yours?

4    **A.** Correct. They were parked on the south side

5    of the street, facing westbound. We were coming

6    down the street eastbound.

7    **Q.** Okay. So when you were looking at the

8    driver of -- the front part of their Lumina, the

9    Lumina that was parked, were you looking out the

10   right-hand side or the left-hand side of your car?

11   **A.** Right-hand side.

12   **Q.** As you're looking out the right-hand side of

13   the rear passenger seat window, at the Lumina, what

14   did you see?

15   **A.** Well, as we were pulling up, I saw the two

16   guys run from the sidewalk area.

17   **Q.** Were those two guys anywhere near the front

18   door or -- the front door of the Lumina that was

19   parked or the passenger door?

20   **A.** They started running as we started coming

21   down the block. They were on the sidewalk side so

22   they were nowhere near the passenger side. They

23   were on the sidewalk and took off running. I

128

1    couldn't tell how close they were to any cars.

2    **Q.** Got you. Go ahead.

3    **A.** As we pulled down the street, there were a

4    few people standing on the sidewalk right along the

5    fence line. When we pulled up, we exited the car,

6    Detective Taylor and I got out about the same time.

7    I focused in on the driver, the person seated in

8    the driver's seat, and went and started going over

9    in that direction.

10   **Q.** Do you see the person that was in the

11   driver's seat of the Lumina that was parked that

12   you guys came up and were facing in the court room

13   today?

14   **A.** Yes, I do.

15   **Q.** Can you point him out for the members of the

16   jury?

17   **A.** He's seated at the rear defense table with

18   the light blue shirt on.

19      MR. MILLER: The record should reflect the

20   witness has identified the defendant Larry Johnson.

21   BY MR. MILLER:

22   **Q.** Tell the members of the jury what you

23   saw -- where was Mr. Johnson in this whole thing?

| | |
|---|---|
| 1 Where was he seated or standing or whatever? | 1 say stop when I'm as close to you as you were to |
| 2   A. He was seated in the driver's seat of the | 2 Mr. Johnson when you saw him make the motion that |
| 3 Lumina. | 3 you're about to describe. |
| 4   Q. Was he by himself? | 4   A. Stop. Right in that general vicinity. |
| 5   A. No. There was a female sitting in his lap. | 5   MR. MILLER: The record should reflect maybe |
| 6   Q. In the driver's seat? | 6 between 10 and 12 feet, Your Honor. |
| 7   A. Correct. | 7   Go ahead. Tell the members of the jury what |
| 8   Q. Was the door to the Chevy Lumina that | 8 you saw from this position. |
| 9 Mr. Johnson was in, with the female in his lap, | 9   THE COURT: Initially when we came out, I |
| 10 open or closed? | 10 saw him lift and push the female out. At that |
| 11   A. Open. | 11 point I saw his right hand on her back, as he was |
| 12   Q. Tell the members of the jury what you saw as | 12 pushing her out. His hands then went down below to |
| 13 you approached Mr. Johnson on foot. | 13 where I couldn't see them and then around to the |
| 14   A. Mr. Johnson was sitting in the driver's | 14 side. And at that point I heard a metal object |
| 15 seat, the female was sitting kind of 90 degrees | 15 strike the ground. Detective Taylor still yelling |
| 16 with her feet sitting outside the door of the car. | 16 show your hands. His hands came out to the side, |
| 17   When I stepped out, I looked right at | 17 out the open door. |
| 18 Mr. Johnson. He kind of had a surprised look on | 18 BY MR. MILLER: |
| 19 his face. His eyes got real big. He then lifted | 19   Q. You say you heard the sound of something |
| 20 and pushed the female off of his lap onto the | 20 metal hit the ground. What did you think it was? |
| 21 sidewalk, and she then walked away from the car. | 21   A. I thought it was a weapon. I thought it was |
| 22   At that point Detective Taylor was yelling | 22 a gun. |
| 23 show your hands, show your hands. Mr. Johnson then | 23   Q. Why did you think that? |

| 130 | 132 |
|---|---|
| 1 reached down below my view down towards the floor | 1   A. We train three times a year at a range with |
| 2 of the car. | 2 an asphalt ground, and we train 10 to 25 people |
| 3   Q. I want to stop you there. I want you to | 3 shooting at a time. Over the last several years |
| 4 actually show the jury -- pretend for a moment that | 4 people have dropped guns while we've been at that |
| 5 you're Mr. Johnson and I want you to physically | 5 range and the sound was familiar to me as the sound |
| 6 back up enough so you can physically show the jury | 6 of that. |
| 7 what you saw him do with his hands during that | 7   Q. When you first saw him -- after Officer |
| 8 time. | 8 Taylor was yelling for people to show their hands |
| 9   THE COURT: Excuse me. I don't know that | 9 and you indicate that he reached down below |
| 10 the jury can see. | 10 his -- what area of the car did he reach down |
| 11   MR. MILLER: Maybe if you could slide to the | 11 toward? |
| 12 open area. | 12   A. He reached towards -- I couldn't tell if it |
| 13   THE WITNESS: When I was there I was | 13 was the floor or under the seat. It was down low. |
| 14 standing in front of the car, so the dashboard was | 14 It looked to be the floor area or close to the |
| 15 actually blocking what I could see also. | 15 front of underneath the seat. |
| 16 BY MR. MILLER: | 16   Q. What did you do when you saw him do that? |
| 17   Q. So this jury box actually provides a pretty | 17   A. Draw my weapon. |
| 18 decent vantage point as far as the jury -- | 18   Q. And go ahead and try to describe -- did you |
| 19   A. Correct. Because I was standing in front of | 19 stay where you were or did you approach the car? |
| 20 the car looking through with the dashboard. So a | 20   A. I was slowly moving around the front end of |
| 21 normal -- if you're standing in front of a car | 21 the car. When I saw his hands go down, I drew my |
| 22 looking at a car, what you would see is what I saw. | 22 weapon, pointed it at him and slowly moved around |
| 23   Q. I want to walk toward you, and I want you to | 23 the front of the car. |

| 134 | 136 |
|---|---|

1  Q. Toward which side?

2  A. Towards the open door. I was going around

3  or slowly going around the driver's side of the

4  door.

5  Q. You indicated previously at one point he put

6  his hands out the door?

7  A. Correct.

8  Q. During the time that you got out of your car,

9  or as you pulled up there, got out of your car,

10  walked toward the car, saw what you just saw, drew

11  your weapon and came to the side of the car, did

12  you ever see anyone else in the immediate area of

13  that driver's side door?

14  A. No.

15  Q. Did you see anybody else look like they drew

16  something there?

17  A. No.

18  Q. Continue. You indicated that you drew your

19  weapon and were approaching Mr. Johnson?

20  A. Correct. As I drew my weapon and started

21  coming around the side, once his hands came back up

22  and into my view, they came out through the open

23  door. I then went around the car and detained

---

1  marked for identification. May I approach the

2  witness, Your Honor?

3      THE COURT: Yes.

4  BY MR. MILLER:

5  Q. Showing you what's been marked as State's U

6  for identification, do you recognize that?

7  A. Yes.

8  Q. What does that appear to be?

9  A. That's a photograph of the weapon that I

10  recovered that evening.

11  Q. And when did you take that photo?

12  A. After it had been processed.

13  Q. When you say processed, for latent

14  fingerprints?

15  A. Yes.

16  Q. Were there any of value found on that

17  weapon?

18  A. No.

19  Q. Were you present when the weapon was

20  processed?

21  A. Yes.

22      MR. MILLER: I would like to move this item

23  into evidence, Your Honor.

---

134

1  Mr. Johnson.

2  Q. Okay. After you detained Mr. Johnson, did

3  you look under the car?

4  A. Yes.

5  Q. Tell the members of the jury what you saw

6  when you looked under the vehicle.

7  A. I saw a handgun underneath the car.

8  Q. Did you leave it there or what did you do?

9  A. No, I recovered it. I pulled that gun out

10  and set it up on the roof of the car and cleared

11  it, making it safe to handle.

12  Q. Okay. When you say cleared it, you mean?

13  Just briefly describe it. It may be obvious to

14  most people, but.

15  A. Opened the gun up, took the bullets out of

16  the gun, make it safe to handle.

17  Q. Did you later take that weapon back to the

18  police station with you?

19  A. Yes.

20  Q. And did you request that an officer process

21  that gun for latent fingerprints?

22  A. Yes.

23      MR. MILLER: I would like to have this

---

136

1      THE COURT: Any objection?

2      MR. FIGLIOLA: No, Your Honor.

3      MR. HEYDEN: No, Your Honor.

4      THE CLERK: State's Exhibit 70 is so marked,

5  Your Honor.

6      MR. MILLER: Could I ask the bailiff to turn

7  the Elmo on.

8  BY MR. MILLER:

9  Q. Officer, the picture should come up shortly.

10  There we go.

11      You indicated this is the gun?

12  A. Yes.

13  Q. There's a manila envelope underneath the

14  gun?

15  A. Yes.

16  Q. There appears to be some powder, some

17  blackness around the edges of this manila folder.

18  What is that?

19  A. The powder used to dust the gun for prints.

20  Q. And you indicated you took this photograph

21  on that night?

22  A. Yes, I did.

23      MR. MILLER: I would like to have this item

1  marked for identification, Your Honor.

2      THE CLERK:  State's identification V is so

3  marked, Your Honor.

4  BY MR. MILLER:

5      **Q.** Showing what's been marked State's

6  identification V, without showing the jury the

7  context of that box, can you take a look at it and

8  tell me if that appears to be the weapon that you

9  recovered that night during what you just

10  described?

11      **A.** Yes.

12      MR. MILLER:  I move that item into evidence,

13  Your Honor.

14      Your Honor, without objection we would like

15  to enter this as the next State's exhibit.

16      MR. HEYDEN:  That's correct.

17      THE CLERK:  State's Exhibit 71 is so marked,

18  Your Honor.

19      THE COURT:  Mr. Figliola, no objection?

20      MR. FIGLIOLA:  No objection, Your Honor.

21      MR. MILLER:  And, Your Honor, if I can just

22  briefly display these items to the jury.

23      THE COURT:  Why don't you have him tell us

                                    138

1  what they are.

2  BY MR. MILLER:

3      **Q.** Can you show the items to the jury and tell

4  us what they appear to be.  At least show the jury

5  what items that you recovered that night.

6      THE COURT:  Recovered from where?

7      MR. MILLER:  I'm sorry, Your Honor.

8      THE COURT:  Recovered from?

9      MR. MILLER:  Underneath the car.

10      THE COURT:  Oh, underneath the car, okay.

11      MR. MILLER:  Go ahead.

12      THE WITNESS:  17 live nine-millimeter

13  bullets, which were loaded into the magazine for

14  the gun.

15  BY MR. MILLER:

16      **Q.** And was the magazine in or out of the gun?

17      **A.** In the gun.  When I cleared it to make it

18  safe, I took that out of the gun.

19      **Q.** Is that the weapon itself?

20      **A.** Yes.

21      **Q.** Can you just display that briefly for the

22  jury.

23      **A.** (Indicating).

1      **Q.** What kind of weapon is that?

2      **A.** It is a Luger model P89, 9-millimeter

3  handgun.

4      **Q.** 9-millimeter handgun?

5      **A.** Yes.

6      MR. MILLER:  I have no further questions for

7  this witness, Your Honor.

8      THE COURT:  Mr. Heyden.

9      MR. HEYDEN:  Thank you.

10          CROSS-EXAMINATION

11  BY MR. HEYDEN:

12      **Q.** Officer, good afternoon.

13      **A.** Good afternoon.

14      **Q.** Let me make sure that I understand the

15  position of the cars and all.

16      You're the Johnson vehicle, okay?

17      **A.** Okay.

18      **Q.** And you're traveling in this direction?

19      **A.** It's parked alongside the street.

20      **Q.** I'm sorry.  You're parked.

21      And the car that you were in was coming in

22  this direction?

23      **A.** Correct.

                                    140

1      **Q.** All right.  On that side of the road?

2      **A.** Down the center of the street.

3      **Q.** Down the center?

4      **A.** Yes.

5      **Q.** So then the cars are facing each other?

6      **A.** Correct.

7      **Q.** And you're on the -- from where you are in

8  the Johnson vehicle to your left would be the

9  sidewalk?

10      **A.** Correct.

11      **Q.** And then to your right would be the rest of

12  the roadway?

13      **A.** Correct.

14      **Q.** Okay.  And now as your vehicle, the police

15  vehicle, pulled up, you said there were two black

16  males on the sidewalk and they ran away?

17      **A.** Yes.

18      **Q.** So they would be to the left-hand side of

19  the Johnson vehicle?

20      **A.** Correct.

21      **Q.** And did you ever -- you never found out

22  their names?

23      **A.** No.

**141**

1  Q. And then Mr. Johnson you say was in the
2  driver's seat?
3  A. Correct.
4  Q. And then there was a girl in his lap?
5  A. Correct.
6  Q. Was there someone in the front passenger
7  seat?
8  A. Yes.
9  Q. Was it one person, two people?
10  A. One -- when I got out of the car I focused
11  on the driver. I didn't even notice the passenger
12  until later on.
13  Q. Okay. But there was someone in the
14  passenger seat?
15  A. Correct.
16  Q. Was that a black male?
17  A. Yes.
18  Q. Was there anyone in the back seat?
19  A. No.
20  Q. Besides the two men or the two black males
21  that were on the sidewalk who ran, there were more
22  black males on the sidewalk?
23  A. Black females.

**142**

1  Q. Black females?
2  A. Yes.
3  Q. So on the sidewalk were two black males, two
4  black females?
5  A. I can't give you a number of how many black
6  females. There were several people up against the
7  fence line.
8  Q. Okay. And the fence would be right beyond
9  the sidewalk, to your left?
10  A. Correct. Where the sidewalk ends there was
11  a fence.
12  Q. And then so you had outside of the car four
13  to five people perhaps?
14  A. Like I said, I can't give you the specific
15  number. It was probably four to seven people,
16  somewhere in that vicinity.
17  Q. And what time of day was this?
18  A. Approximately 10:50 p.m.
19  Q. 10:50 at night?
20  A. Yes.
21  Q. And were there streetlights there?
22  A. Yes.
23  Q. And it was illuminated also by your

**143**

1  headlights?
2  A. Yes.
3  Q. And the interior light also was on? That
4  was on?
5  A. Yes.
6  Q. Was the passenger side door open?
7  A. No.
8  Q. Was the car a four door or two door?
9  A. Four door.
10  Q. Were any of the back doors open?
11  A. No.
12  Q. It was just the front driver's side?
13  A. Correct.
14  Q. Now, when you got out, you were in the back
15  seat?
16  A. Yes.
17  Q. Okay. Did you run towards this vehicle?
18  A. I walked briskly. I wouldn't say I ran.
19  Q. And some of the people took off, some of the
20  people stayed there and then you saw Mr. Johnson
21  push the girl off his lap?
22  A. Correct.
23  Q. And this happened all in the space between

**144**

1  where Mr. Miller was standing and where you were
2  sitting down?
3  A. Yes.
4  Q. Now, as you got there -- obviously you
5  couldn't see what was going on behind the driver's
6  door that was open, correct?
7  A. Correct.
8  Q. And you never ever saw a gun in
9  Mr. Johnson's hand, correct?
10  A. Correct.
11  Q. But there was a bunch of body movement, and
12  then you heard metal?
13  A. Correct.
14  Q. And was the door moving as the girl got off
15  of Mr. Johnson's lap and went to the sidewalk?
16  A. No. The door was as far open as it could
17  go.
18  Q. But you didn't push it so it went back
19  further?
20  A. No. It was already open.
21  Q. But did it move at all?
22  A. No. He lifted and pushed her off and she
23  went up towards the fence line.

1    Q. Now, you went and you looked under the car
2    and you found a gun?
3    A. Correct.
4    Q. Did you pick the gun up?
5    A. Yes.
6    Q. And how did you pick the gun up?
7    A. I tried to pick it up in areas on the gun so
8    I wouldn't mark any fingerprints that might be on
9    it, disturb it.
10    Q. So how would you do that?
11    A. Use my finger -- or my thumb and my
12    forefinger, and touching it in areas where there
13    was grooves on the grips.
14    Q. Did you have to get down on your hands and
15    knees to reach under the car?
16    A. Yes.
17    Q. And then you had to reach full arm length
18    under the car?
19    A. I would say probably two, two-and-a-half
20    feet from the curb.
21    Q. Okay. And did you have a flashlight?
22    A. I don't recall if I did or not.
23    Q. And then you grabbed the gun and I guess you

1    direction; is that correct?
2    A. Yes.
3    Q. Now, and there were a lot of people in the
4    street when you first pulled up?
5    A. No, they were on the sidewalk.
6    Q. They were on the sidewalk?
7    And where was Johnson's car?
8    A. Parked.
9    Q. Right next to the sidewalk?
10    A. Probably about 10, 12 inches from the
11    sidewalk.
12    Q. And the driver's side door, would that have
13    been next to the sidewalk or away from the
14    sidewalk?
15    A. Next to the sidewalk.
16    Q. Next to the sidewalk, okay.
17    So the people that were standing on the
18    sidewalk would have been standing close to the car?
19    A. I would say within eight to ten feet. They
20    were mostly up along the fence line.
21    Q. Okay. And two guys run?
22    A. Correct.
23    Q. Okay. Now, did they run past the car?

146

1    tried not to put your own fingerprints on it?
2    A. Correct.
3    MR. HEYDEN· Okay. Thank you.
4    THE COURT: Mr. Figliola?
5    MR. FIGLIOLA: Thank you, Your Honor.
6    BY MR. FIGLIOLA:
7    Q. Good afternoon, Detective.
8    A. Good afternoon.
9    Q. How long did you say you had been on the
10    Vice squad when this incident occurred?
11    A. It was my first day.
12    Q. Your very first day?
13    A. Yes.
14    Q. Pretty good catch for your very first day,
15    wasn't it?
16    A. I guess you could say so.
17    Q. Now, the Johnson vehicle, you approached
18    that you said -- if I'm wrong, fine. Did you
19    approach that from the rear of the vehicle or the
20    front of the vehicle?
21    A. From the front of the vehicle.
22    Q. Okay. And that's because you entered the
23    street -- you entered a one-way street in the wrong

148

1    A. They ran the opposite direction that we
2    came. They were running westbound. I'm sorry,
3    they were running in the same direction that we
4    came. They were running westbound. I'm sorry,
5    they were running eastbound.
6    Q. Eastbound, okay.
7    They were running away from you?
8    A. Yes.
9    Q. Were they black males?
10    A. Yes.
11    Q. Could you tell how big they were, young,
12    age, nothing?
13    A. No.
14    Q. You didn't pursue them, did you?
15    A. No.
16    Q. Anybody else run?
17    A. Other than those two, no.
18    Q. Okay. How many people were still left out
19    there?
20    A. I can't give you a specific number. I would
21    say four, five to seven, somewhere in that general
22    vicinity.
23    Q. And the Dodge Stratus, was that behind the

1 Lumina?

2     **A.** Yes.

3     **Q.** How close to the Lumina was the Stratus?

4     **A.** A couple of feet.

5     **Q.** A couple of feet?

6     **A.** Yes.

7     **Q.** And who focused on the Dodge Stratus?

8     **A.** Detective Richie.

9     **Q.** Okay. And you and Detective Taylor focused

10 on the Lumina?

11     **A.** Correct.

12     **Q.** And did you have your guns drawn when you

13 first got out of your police vehicle?

14     **A.** I didn't. I can't speak for anybody else.

15 I don't know.

16     **Q.** Okay. Now, you said that someone was

17 sitting in Mr. Johnson's lap, a female?

18     **A.** Yes.

19     **Q.** When Detective Taylor or Detective Richie,

20 which one, orders their hands up and out of the

21 car, was that standard police protocol?

22     **A.** He just ordered show your hands. He didn't

23 say anything about out of the car, just ordered

---

1 sitting in the same position.

2     **Q.** Where was his left hand at this time?

3     **A.** Still out of my view.

4     **Q.** Where was his right hand?

5     **A.** His right hand was in my view for a very

6 brief time and then went back down out of my view.

7     **Q.** Which hand do you believe he had the gun in?

8     **A.** I don't know.

9     **Q.** You don't know. When you saw him push the

10 girl out of the car with his right hand, you saw

11 his right hand?

12     **A.** At that point, yes.

13     **Q.** So he didn't have a gun in his hand, did he?

14     **A.** No, not at that point, no.

15     **Q.** So you believe maybe he got the gun after

16 the fact, is that what you're saying?

17     **A.** There's a possibility, yes.

18     **Q.** Anything is possible, right?

19     **A.** Yes.

20     **Q.** Okay. Now, Mr. Johnson told you it wasn't

21 his gun when you found it, didn't he?

22     **A.** Yes.

23     **Q.** Now, where was the gun actually located?

---

150

1 show your hands.

2     **Q.** Okay. So the female passenger sitting

3 on -- if you know. The female passenger sitting on

4 Johnson's lap didn't get out on the command of

5 Detective Taylor?

6     **A.** While Detective Taylor kept repeating that

7 phrase show your hands, Mr. Johnson lifted her and

8 kind of pushed her out at that point.

9     **Q.** He lifted her with two hands?

10     **A.** He used his left hand down low and his right

11 hand.

12     **Q.** So you could see both of his hands?

13     **A.** No. I could see his right hand.

14     **Q.** So you just said that his left hand was down

15 below and his right hand was up top. That's not

16 right, is it?

17     **A.** By the motions that I saw, his left hand was

18 down low, because as she is getting up, his left

19 arm was moving up also. His hand was out of my

20 view though.

21     **Q.** Then after she gets out of the car what does

22 he do, sit back down?

23     **A.** He never got up at that point. He was still

---

152

1     **A.** When I recovered it it was about 2,

2 two-and-a-half feet underneath the vehicle on the

3 ground, right -- or right underneath the front

4 seats of the car but on the ground outside.

5     **Q.** Underneath the car?

6     **A.** Correct.

7     **Q.** About two-and-a-half feet under?

8     **A.** Between two, and two-and-a-half feet.

9     **Q.** How many times did you hear this gun bounce

10 on the asphalt?

11     **A.** Once.

12     **Q.** Just once. You didn't actually see

13 Mr. Johnson throw a gun, did you?

14     **A.** No, I didn't.

15     **Q.** Now, how many people were actually around

16 the Johnson vehicle when this all occurred?

17     **A.** Can you just give me a definition of how

18 close you mean by around? Because there were

19 several people on the fence line. Nobody was up to

20 any of the windows.

21     **Q.** Okay. And your focus was directly on

22 Mr. Johnson, correct?

23     **A.** Correct.

1  Q. So if somebody walked up to the Lumina,
2  you're focusing on Johnson, you wouldn't even have
3  seen them, would you?

4  A. Not unless they were right by Mr. Johnson.

5  Q. Okay. I think you previously told
6  Mr. Heyden there was five to seven feet in the
7  general vicinity?

8  A. Along the fence line, yes.

9  Q. So you don't consider along the fence line
10  along the Lumina?

11  A. That's about, I would say, approximately
12  eight to ten feet away.

13  Q. So if you were saying they're eight to ten
14  feet away, they're not around the Lumina, right?

15  A. Correct.

16  Q. Now, do you remember testifying at a
17  previous proceeding involving this matter?

18  A. Yes.

19  Q. And do you remember testifying that there
20  were five or seven people? The question was asked,
21  was there anybody standing around the Lumina. This
22  is 52 and 53.

23     Do you recall being asked whether there were

1  We are going to have to wrap it up,
2  Mr. Figliola. We can bring the witness back
3  tomorrow if you have --

4     MR. FIGLIOLA: I'm probably only going to
5  have one more question if we get this revolved,
6  Your Honor.

7     THE COURT: All right.

8  BY MR. FIGLIOLA:

9  Q. I just want to get back. Obviously you're
10  trained to pick up a vehicle -- I mean a weapon,
11  right?

12  A. Yes.

13  Q. You picked up a weapon so your prints do not
14  get on the weapon?

15  A. The best I can, yes.

16  Q. Okay. And you did that, correct?

17  A. Yes.

18  Q. Now, when you say it was dusted for latent
19  prints, were there latent prints --

20  A. I didn't personally dust it. It was taken
21  to the evidence unit to be dusted and I was told
22  there were no prints on it.

23  Q. When you say no prints, that means no prints

---

154

1  other individuals around the Lumina?

2  A. Vaguely, yes.

3  Q. And do you recall saying there were five to
4  seven in the area?

5  A. Vaguely, yes.

6  Q. Okay. But what you're saying here today
7  when you said area, you didn't mean next to the
8  Lumina?

9  A. Well, area I consider -- I'm not giving a
10  specific area.

11  Q. Okay. But you were specifically asked in
12  the area of the Lumina, were you not?

13  A. Yes, I believe so.

14  Q. Okay. And you said five to seven people.
15  Now, when you say that you took latent fingerprints
16  of the gun --

17     MR. MILLER: Excuse me, Your Honor. May I
18  have just one moment?

19     THE COURT: While they're conferring, we
20  went a little past 5 o'clock and I want to know
21  whether that is a problem.

22     Is that starting to present a problem for
23  some of you? All right.

156

1  at all, not Mr. Johnson's, not anybody else's?

2  A. I don't know if it means no prints. No
3  identifiable prints. There was negative results
4  for it.

5  Q. Negative results for Mr. Johnson?

6  A. Correct.

7     MR. FIGLIOLA: Nothing further.

8     RE-DIRECT EXAMINATION

9  BY MR. MILLER:

10  Q. Is that uncommon, Detective Silvers, when it
11  comes to a firearm for it to be processed for
12  latent fingerprints and there to be no identifiable
13  fingerprints on it?

14  A. Is it common? Yes, it's very common.

15  Q. Common that there are no identifiable
16  fingerprints?

17  A. Right.

18  Q. Turning your attention to a couple other
19  issues, you indicated that you were focused on the
20  driver, not so much the passenger?

21  A. Correct.

22  Q. Mr. Figliola asked you whether or not the
23  passenger door was open. You said --

A-19

**157**

1 A. No.
2 Q. And you indicated later that the passenger
3 was a -- in terms of race and sex?
4 A. Black male.
5 Q. And do you remember what his name was?
6 A. I believe it was Ronald Wallace.
7 Q. Okay. Did he ever make any motions,
8 anything like the motions you saw Mr. Johnson make?
9 A. I was focused on Mr. Johnson. I couldn't
10 tell you.
11 Q. Did you ever see his door open during any of
12 this time?
13 A. No.
14 Q. One other question. As far as what was
15 underneath the car, you indicated you looked under
16 the car and the gun was there. Was there anything
17 else under there other than the gun?
18 A. No.
19 MR. MILLER: Nothing further, Your Honor.
20 THE COURT: Mr. Heyden.
21 MR. HEYDEN: Just one.
22 RECROSS-EXAMINATION.
23 BY MR. HEYDEN:

**158**

1 Q. I understand that your focus was on the
2 driver, but would it be fair to say that when the
3 police got there the police got everybody out of
4 the car including the passenger?
5 A. Yes.
6 Q. So then the front passenger door did
7 open and Mr. Wallace got out?
8 A. At some point, yes. I didn't observe it
9 though.
10 Q. Okay. So you didn't know what Mr. Wallace
11 had in his hand or what he did?
12 A. Detective Taylor was focused on Mr. Wallace.
13 I don't know.
14 MR. HEYDEN: Thank you.
15 THE COURT: Mr. Figliola?
16 MR. FIGLIOLA: Briefly along those same
17 lines, Detective.
18 BY MR. FIGLIOLA:
19 Q. As you drove up, people started to scatter,
20 two people ran?
21 A. Two people ran, yes.
22 Q. Did you take notice of whether anybody threw
23 anything or discarded of anything?

**159**

1 A. I couldn't see anything, no.
2 MR. FIGLIOLA: Thank you.
3 MR. MILLER: Prompts no redirect from me,
4 Your Honor.
5 THE COURT: Very well.
6 Mr. Heyden.
7 MR. HEYDEN: Nothing. Thank you, Your
8 Honor.
9 THE COURT: All right. That completes your
10 testimony. You may step down.
11 Ladies and Gentlemen, we will resume -- I
12 didn't talk to counsel yet -- at 10 a.m.
13 MR. MILLER: Sounds good, Your Honor.
14 THE COURT: We will resume tomorrow morning
15 at 10 a.m. Once again, I remind you please do not
16 discuss the case. Please do not do any of your own
17 investigation. Please do not check out the
18 streets. Please do not do anything at all.
19 Everything you use as the basis for your
20 decision has to come to you in this court room.
21 All right? No conversations.
22 See you tomorrow at 10. Thank you.
23 (Jury leaves courtroom at 5:15.)

**160**

1 THE COURT: All right, counsel. Can we just
2 calm down for just a minute here. Can I hear from
3 the State what your plan is for tomorrow.
4 MR. GEORGE: Yes. We are going to move into
5 1348, home invasion at 1348, and then the
6 collection of evidence there, and then we have an
7 ATF agent coming down to talk about ballistics.
8 THE COURT: Okay. Was there -- I recall a
9 motion in limine that had to do with the Lancaster
10 Avenue testimony evidence. Is there an issue from
11 the defense side?
12 MR. FIGLIOLA: Not from defendant Johnson,
13 Your Honor.
14 Your Honor, while they're speaking there is
15 something maybe we can address and it's -- this
16 case, as you are aware, I think is going faster
17 than anybody has anticipated.
18 I initially -- and I can't speak for Mr.
19 Heyden. I subpoenaed my witnesses for Tuesday and
20 now it looks like I may have to try to get them
21 here on Monday.
22 THE COURT: We can delay.
23 MR. FIGLIOLA: Thank you.